FILED
2009 Aug-25  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CASSANDRA D. PATTERSON o/b/o C.L.W., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:08-CV-1333-LSC |
| MICHAEL J. ASTRUE, Commissioner, Social Security Administration | ) ) ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

I.   Introduction.

Plaintiff, Cassandra D. Patterson, on behalf of her minor child, C.L.W. ("Claimant"), appeals the decision of the Administrative Law Judge ("ALJ") denying her application for Child's Supplemental Security Income ("SSI"). Ms. Patterson has timely pursued and exhausted her administrative remedies and the decision of the ALJ is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant was thirteen years old at the time of the ALJ's decision. (Tr. at 26.) Plaintiff believes that her son became disabled on May 6, 2003, due to attention deficit hyperactive disorder ("ADHD"). (Doc 8 at 2.)

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act which amended the statutory standard for determining child SSI. *See* P.L. No. 104-193, 110 Stat. 2105. The revised standard states that:

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(1). On September 11, 2000, the SSA published the final rules implementing the act. *See* 65 Fed. Reg. 5471. These rules became effective on January 2, 2001. *See id.*

When evaluating the disability of a child, the regulations prescribe a three-step sequential evaluation process. *See* 20 C.F.R. § 416.924(a). The first step requires a determination of whether the child is "doing substantial gainful activity." *Id.* If he or she is, then the child is not disabled and the

evaluation stops. *Id*. If the child is not engaged in substantial gainful activity, the second step requires the ALJ to determine whether he or she suffers from a severe impairment or combination of impairments. *Id*. An impairment is considered "severe" if it causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). If the impairments are not severe, the analysis stops. 20 C.F.R. § 416.924(a). However, if the impairments are "severe," the third step requires the ALJ to determine if one or more of the impairments meets or equals an impairment listed in Appendix 1 to Subpart P of Part 404. *Id*. If the child has such an impairment and it meets the durational requirement, the ALJ will find that he or she is disabled. *Id*. If they do not meet each of the criteria enumerated in the listings, the ALJ must decide whether the impairment or combination of impairments "functionally equals" the severity of any listed impairment. *See* 20 C.F.R. § 416.924(d).

When assessing a child's functional limitations, the ALJ considers all of the relevant factors, such as: how well the child can initiate and sustain activities, how much extra help he or she requires, the effects of structures or supportive settings, how the child functions in school, and the effects of

medications or other treatments on the child's health. 20 C.F.R. § 416.926a. To determine functional equivalence, the ALJ must evaluate the child's limitations in the following six functional areas, called domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) the ability to care for himself; and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1)(i-vi). An impairment, or combination of impairments, functionally equals a listed impairment if it results in either "marked" limitations in two of the previously mentioned domains or an "extreme" limitation in one domain.[1] *See* 20 C.F.R. § 416.926a(a).

Applying this sequential evaluation, the ALJ found that Claimant has not engaged in substantial gainful activity at any time relevant to the decision. (Tr. at 26.) Based on the evidence presented, the ALJ concluded that his ADHD and oppositional defiant disorder ("ODD") are considered "severe" according to 20 C.F.R. § 416.924(c). *Id*. Nonetheless, the ALJ

---

[1]For purposes of deciding the overall limitation in the six functional domains, a "marked" limitation is one that "seriously" interferes with functioning, and an "extreme" limitation is one that "very seriously" interferes with functioning. *See* 20 C.F.R. § 416.926a(e)(2) and (3).

determined that these impairments, when considered singularly or in combination, did not medically meet or equal the severity of any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* In evaluating functional equivalence, the ALJ found that Claimant does not have an impairment that meets or medically equals the listings in 20 CFR 416.924(d) and 416.926(a). *Id.* at 26. In the domains of acquiring and using information and attending and completing tasks, the ALJ found Claimant's impairments caused a "less than marked limitation." *Id.* at 35-36. In the area of interacting and relating with others, the ALJ found a "marked limitation." *Id.* at 38. In the domains of moving about and manipulating objects, caring for yourself, and health and physical well-being, the ALJ found Claimant has "no limitation." *Id.* at 39-40. The ALJ concluded by finding that "Claimant has not been disabled, as defined by the Social Security Act, since August 11, 2004, the date the application was filed (20 CFR 416.924(a))." *Id.* at 40.

II.     Standard of Review.

The Court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining: (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner; and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The Court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the evidence preponderates against the Commissioner's

decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of the claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

III. Discussion.

Plaintiff alleges that the ALJ's decision should be reversed or remanded for one reason. (Doc. 8 at 10-13.) Plaintiff claims the ALJ's "findings as to C.L.W.'s level of impairment under the childhood functional ratings is contrary to the substantive weight of the evidence." *Id*. at 10. Specifically, based on teacher evaluations and the opinion of Dr. Sahlie, Plaintiff submits the ALJ should have found a marked level of impairment in the domain of attending and completing tasks. *Id*. at 11.

In determining disability, the ALJ considers evidence from "acceptable medical sources," which include licensed physicians and licensed or certified

psychologists. 20 C.F.R. § 416.913(a). The ALJ can consider evidence not only from medical sources, but also "evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work or, if you are a child, how you typically function compared to children your age who do not have impairments." 20 C.F.R. § 416.913(d). These "other sources" can include school teachers, counselors, developmental center workers, and parents. *Id.* "The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 416.927(d)(3). The weight given to opinions of non-examining sources "will depend on the degree to which they provide supporting explanations for their opinions." *Id.*

A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had

with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, "good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (*citing Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

As noted by the ALJ, Dr. Elizabeth Sahlie has been Claimant's treating physician since July 2001. (Tr. at 29.) In May 2002, Dr. Sahlie initiated a trial of Concerta and referred Claimant to TCHA Behavioral Health for counseling. Dr. Sahlie scheduled follow-up appointments for Claimant, however he failed to show on multiple occasions and did not report for counseling. *Id.* In November 2002, Claimant returned. At the time, he had

been suspended for fighting and his conduct grades were failing.  Claimant's mother reported she made an appointment for Claimant at Children's Behavioral Health ("CBH"), so Dr. Sahlie prescribed Claimant a two week supply of Concerta at 36 mg, with refills contingent on following through with CBH.  *Id.*  Claimant did report to counseling with Dr. Jodi Brooks, Ph.D., but only on two occasions (in early 2003 and in May 2003).  *Id.*

Claimant did not return to Dr. Sahlie until October 2003, at which time he complained of behavioral problems at school due to hyperactive behavior.  (Tr. at 29.)  Dr. Sahlie again placed Claimant on Concerta at 36 mg.  When he returned for a scheduled visit in February 2004, Claimant was making the A/B Honor Roll and his mother stated she was pleased with his response to Concerta.  *Id.*

In July 2004, Claimant again returned to Dr. Sahlie.  (Tr. at 30.)  Dr. Sahlie noted that he had not been consistently taking his medication and was having behavioral problems.  She again prescribed Concerta 36 mg, with no refills, and recommended that counseling be resumed.  Claimant again failed to follow through with counseling.  In August and September 2004, Dr. Sahlie prescribed Concerta, but on November 3, 2004, Claimant returned.

He had been suspended for fighting and, while Claimant's mother said he was regularly taking his medication, she claimed that it was not doing anything.[2]  Dr. Sahlie increased Claimant's Concerta to 54 mg once a day. *Id.*

In January 2005, because Claimant was scheduled to see Dr. Brooks for counseling, Dr. Sahlie provided another refill of Concerta.  (Tr. at 31.)  However, Claimant once again failed to show up for counseling. *Id.* In April 2005, Claimant's mother requested another refill from Dr. Sahlie and she informed Dr. Sahlie that Claimant had not returned to counseling because she thought he was doing well without it.  Although Dr. Sahlie refilled the medication, she informed Plaintiff that she would not provide another refill

---

[2]It should be noted that the ALJ found Plaintiff's testimony to be not fully credible. (Tr. at 33.)  Plaintiff testified that Claimant had to stop seeing Dr. Brooks because she was out of work and did not have a car.  However, she told Dr. Sahlie they could not attend some of the sessions with Dr. Brooks because the appointments conflicted with her work schedule.  Plaintiff also claimed she was called so often by Claimant's school that she had to quit her job, yet, as noted by Dr. Sahlie, she quit one of her jobs prior to the school year and school records do not support her claims that she was called as often as she claimed.  Finally, although Plaintiff reported to Dr. Gordon (a consultative psychologist) that her son had to attend a new school for the 2004 - 2005 school year because his previous school would not allow him to re-enroll based on bad behavior, teacher questionnaires completed in March 2004 did not indicate any behavioral problems and Plaintiff told Dr. Sahlie that Claimant would be attending a new school because the family had moved. *Id.*

until claimant visited a psychologist on a regular basis. *Id.* at 31, 286. Claimant returned to Dr. Sahlie in July 2005. Dr. Sahlie noted that he was not on any medications at the time, that he reported he was doing well in general, and he was scheduled to start counseling in September 2005. She again told Claimant she would refill the Concerta once he attended counseling and advised him to return in one year. *Id.*

When Claimant returned to Dr. Sahlie in September 2006 for his scheduled check up, he reported to be doing well and that he had not been in any trouble in the last year. (Tr. at 32, 284.) His hyperactivity was under control with 60 mg of Metadate. Claimant was seeing a psychiatrist for his prescriptions, but Dr. Sahlie noted that he was not really seeing a counselor. Dr. Sahlie noted she would refill Claimant's medication with the condition that he return every three months with school records. *Id.* When Claimant returned in December 2006, his school records showed improved performance, and Dr. Sahlie noted he was doing well and continued him on Metadate. *Id.* at 32.

Claimant returned to Dr. Sahlie on April 9, 2007. (Tr. at 32.) His report card showed ten absences, five due to suspensions. Plaintiff claimed

that the infractions occurred before Claimant received his daily medication and denied any behavioral problems at home. On April 30, 2007, after Dr. Sahlie was notified that Claimant was arranging an appointment with a psychologist, she provided a refill of his medication. *Id*.

As noted by the ALJ, Dr. Sahlie also completed Child Development and Functioning Rating/ADHD forms in January 2005 and in September 2006. Claimant points to these forms as evidence of his marked limitation in attending and completing tasks. (Doc. 8 at 12.) On both forms, Dr. Sahlie did indicate a marked degree of limitation in the domain of attending and completing tasks. (Tr. at 27). The ALJ noted that he "completely agrees with those characterizations as they appear consistent with the evidence of record in terms of the claimant's presentation absent treatment." *Id*. at 35. As further noted by the ALJ, Dr. Sahlie elaborated on both findings with additional comments. The first, dated January 24, 2005, stated that Claimant had a good response to medication and tolerated it well, but that his mother "repeatedly failed to follow through with referrals for behavioral intervention in spite of escalating behavioral concerns and increasingly aggressive and destructive behavior." *Id*. at 35, 261. The second comment,

made on the Child Development and Functioning Rating itself, dated September 15, 2006, stated "symptoms reportedly completely resolved on medicine." *Id.* at 35, 182. The ALJ noted that he "affords Dr. Sahlie's opinion in that regard significant weight." *Id.* at 35. Further, on the September 2006 form, upon notation of a marked limitation in attending and completing tasks, Dr. Sahlie noted to the side that this was "without medication." *Id.* at 282.

Not only did the ALJ consider the records of Dr. Sahlie, but he also considered the treatment records of Dr. Jodi Brooks. Claimant first saw Dr. Brooks in 2003, upon Dr. Sahlie's referral to counseling. (Tr. at 29.) From the record, it appears that Claimant failed to show up for appointments with Dr. Brooks in March and April of 2003, but did appear for an appointment in May 2003. *Id.* at 29, 276. Claimant was again scheduled to see Dr. Brooks on March 14, 2005, September 19, 2005, and May 31, 2007, however Claimant again failed to show on any of the three occasions. *Id.* at 31, 279. Claimant finally appeared for an appointment with Dr. Brooks on July 23, 2007. *Id.* at 32, 304. He was not taking medication at the time of the visit and his mother reported he had been suspended eight times within the last

year. Dr. Brooks noted Claimant to have "a pleasant manner, euthymic mood, normal range of affect, no depression, average estimated intellectual functioning, and good concentration in the office." *Id*. Further, she noted Claimant to have ODD, but ruled out ADHD, with a GAF of 60, "consistent with moderate symptoms associated with generally functioning with some difficulty in social and/or school settings." *Id*. Claimant returned to Dr. Brooks on August 27, 2007, at which time he informed her he was doing "OK" in school, with no behavioral problems, but Dr. Brooks noted test scores demonstrating below average receptive language skills and below average visual-motor integration skills. *Id*. at 33, 302. Finally, Claimant reported to Dr. Brooks on September 11, 2007. While he still reported doing "OK" in school, his mother informed Dr. Brooks that he had been suspended from school for three days for throwing paper, gotten detention for three days for playing in the hall, and was suspended from riding the bus because he cursed the bus driver. During this visit, Dr. Brooks administered a test to measure attention, the CPT-II. Claimant "completed the test without difficulty, and results were equivocal, indicating an equal likelihood of his having an attention problem as not having one." *Id*. at 33, 301.

In addition to the medical records, the ALJ also considered questionnaires completed by Claimant's teachers. The ALJ stated that he "affords those opinions considerable weight but must point to the context of their completion." (Tr. at 34.) While Claimant alleges that the ALJ did not properly consider the teacher questionnaire dated May 17, 2007 (Doc. 8 at 11-12), the ALJ specifically considered this questionnaire and properly rejected it. *Id.* The ALJ noted this questionnaire "reflects obvious, serious, and/or very serious problems in almost all areas." The ALJ also noted that Claimant's behavior at school was "particularly bad at the time this form was completed," in that he had been suspended for five days for defiance and was subsequently suspended for criminal mischief. However, based on the entire evidence of record, the ALJ found "the evidence is not persuasive that the claimant was consistently taking his medication as prescribed. He was not in counseling and was not seeing Dr. Sahlie at regular intervals for refills." *Id.* at 34.

There were also other teacher questionnaires/reports noted by the ALJ, which Claimant failed to mention. One, in November 2004, noted numerous problems Claimant was having in all areas. (Tr. at 34.) However,

the teacher went on to report that "since the claimant's medication had been changed, sometime in early November, she had noted a 'remarkable' change in his behavior and attention span." The teacher then remarked that Claimant was "more calm and able to stay focused and on task." *Id*. The other teacher reports noted by the ALJ were forms completed at the request of Dr. Brooks in September 2007. *Id*. While one teacher noted issues with concentration, attention, and social problems, another teacher indicated no problems in her classroom and felt Claimant was creative and needed to be challenged because "mundane tasks bore him," and his boredom leads to problems. *Id*. at 35, 240.

Based upon the entire record, including the opinions of Drs. Sahlie and Brooks, demonstrating Claimant's failure to report for appointments and sporadic taking of medication, and the teacher questionnaires and reports, this Court agrees with the ALJ that Claimant "shows a marked improvement in [the area of attending and completing tasks] when compliant with treatment." (Tr. at 37.)

IV.   Conclusion.

Upon close review of the administrative record, and considering all of Plaintiff's arguments, the Court finds that the ALJ's decision is supported by substantial evidence. A corresponding order will be entered contemporaneously with this Memorandum of Opinion.

Done this 25th day of August 2009.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671